UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NAC GROUP, INC.,

      Plaintiff,

v.                                 CASE NO.: 8:11-cv-1967-T-23EAJ

WELLS FARGO BANK, N.A., f/k/a
WACHOVIA BANK, N.A.,

      Defendants.

_____/

## ORDER

In a previous action, NAC Group, Inc., sued its lender, Wells Fargo, for breach of an oral contract. The contract purported to settle any prospective lawsuit arising from Wells Fargo's misapplying the proceeds of an NAC real estate sale. NAC lost. NAC now sues Wells Fargo for Wells Fargo's misapplying the proceeds of the NAC real estate sale. Claim preclusion requires a party to raise in one action, if at all, each legal claim or defense that arises from "the same transaction or series of transactions." Claim preclusion bars this action, NAC's second action arising from Wells Fargo's misapplying the proceeds of the NAC real estate sale.

*NAC I,* **8:10-cv-1195-T-23TGW**

In 2005, NAC Group, Inc., (the "borrower") received from Wells Fargo (the "lender")[1] a term loan secured by commercial real estate in Pinellas County, Florida. Two years later, the lender extended to the borrower a distinct $1 million line of credit secured by the borrower's accounts receivable.  The loans were not cross-collateralized.

> On June 2, 2008, the borrower sold "a parcel of improved real property owned by [the borrower] and unencumbered" for approximately $1 million.  The borrower alleges that the $1 million generated by the sale "should have been distributed directly to [the borrower] to pay down on the real estate Loan Swap Agreement."  However, the lender "improperly and without authority directed that the proceeds be used to pay down the line of credit, already collateralized by [the borrower's] accounts receivable . . . ."  The "misapplication" of the $1 million occurred "without the prior knowledge and/or approval" of the borrower. Upon learning of the "misapplication," the borrower demanded that the lender apply the $1 million to debt secured by the mortgage on the [real estate] collateral . . . . The lender acknowledged the "mistake" but refused to "properly apply the funds."  As a result, the borrower "was placed in a position of jeopardy of losing potential business opportunities and transactions with respect to the real property owned by [the borrower]."

Order Dismissing *NAC I*, Doc. 7 (quoting the Complaint in *NAC I* (Doc. 2))

The borrower's principal, Johnathan Stanton, attempted to resolve the dispute. On November 20, 2009, two of the lender's officers, Eric Sharpe and Joseph Carter,

---

[1] NAC received the loan from Wachovia, Wells Fargo's predecessor and the defendant in *NAC I*.

instructed Stanton to send a "demand letter."  Stanton's November 25, 2009, letter

offers a settlement:

> To settle this out of court I am willing to accept $850,000.00 and
> the balance of the land of 4.5 acres be released to Johnathan
> Stanton personally. . . . I have been trying for over a year and a
> half to settle this and have gotten nothing but the run around.  We
> need to settle this by the end of Dec[ember] 2009 or I will take this
> all the way to a jury trial.  Also [t]he loan will stay in place and
> [the borrower] will still remain as a good paying customer.

(*NAC I*, Doc. 2, ¶ 22)  Stanton received no written response from the lender, but

Sharpe telephoned Stanton and offered $700,000 and a release of "any and all claims

to the remainder of the real property owned" by the borrower.  Entering an alleged

"oral settlement agreement," Stanton accepted the offer, and Sharpe told Stanton that

an attorney for the lender would send a "confirmatory letter."  On December 31,

2009, Stanton received a call from Carter, who told Stanton to expect a letter that

"would confirm the $700,000 cash settlement figure and release of the land."

On the same day, the lender changed management.  The new management

refused to honor the "oral settlement agreement" between the lender and Stanton.

Instead, the lender's attorney sent Stanton a letter offering the borrower a new

$700,000 line of credit with the lender.  Stanton called the attorney, who stated,

"There are miscommunications going on."  The lender sent Stanton a letter advising

that the lender "would very much like to continue [] discussions with you to reach a

mutually satisfactory arrangement regarding the loans."  Rather than continue to

negotiate, the borrower filed *NAC I*, which alleged only a "breach of an oral settlement agreement," the agreement between Stanton and Sharpe.

Because Section 687.0304, Florida Statutes, prohibits a debtor from "maintain[ing] an action on a credit agreement unless the agreement is in writing," a July 13, 2010, order dismisses (*NAC I*, Doc. 6) the borrower's complaint and grants leave to amend the complaint. A September 3, 2010, order (*NAC I*, Doc. 7) dismisses the action because the borrower failed to amend the complaint.

### The Allegations of *NAC II*, the Present Action

The borrower and the lender "had a multi-loan banking relationship" for several years. The borrower held two loans from the lender. The first was "a term loan" secured by two large separate parcels of commercial real estate owned by the borrower. The second was a line of credit secured by the borrower's receivables. "The two loans were not cross-collateralized and the Credit Line was not secured by any of the commercial property securing the Term Loan." (Doc. 37 at 3)

In 2008, the borrower wanted to "release" the lien on parcel two to permit the development and sale of "sub-parcels." The lender agreed to release the lien on parcel one to permit the borrower both to sell parcel one and to "apply the proceeds . . . to the Term Loan." Through the sale of parcel one, the borrower sought to reduce the loan-to-value ratio of the term loan and to secure the release of the lien on parcel two's sub-parcels. Relying on the prospective release of the lien,

the borrower agreed to sell parcel one to a third-party buyer.  The sale was scheduled to close on Monday, June 2, 2008.

On Wednesday, May 28, 2008, contrary to the borrower's expectations, the lender instructed the closing agent to apply the sale's proceeds to reduce the balance on the credit line (and not the balance on the term loan).  Because the borrower "made substantial commitments to and was heavily reliant upon the closing," (Doc. 37 at 3) the borrower acquiesced, and the lender used the sale's proceeds to reduce the balance on the credit line rather than the balance on the term loan.  Consequently, with only parcel two as collateral, the term loan became "severely" under-secured, and the lender became unable to achieve the loan-to-value ratio requisite to the sale of parcel two's "sub-parcels."  The borrower alleges that the loss of "attending revenue and profit[]" amounts to "hundreds of thousands of dollars." (Doc. 37 at 4)

The borrower alleges (1) breach of the duty of good faith and fair dealing, (2) "common law negligence," (3) fraudulent misrepresentation, (4) breach of fiduciary duty, (5) "wrongful set-off," (6) conversion, (7) tortious interference with business relations, (8) aiding and abetting breach of fiduciary duty, (9) money had and received, (10) and breach of contract.  Additionally, the borrower notes that Florida recognizes no legal claim for "economic duress," but, seeking to "vindicate fundamental rights," the borrower asks for "leave to appeal to the Circuit Court of Appeals for certification to the Florida Supreme Court the question of whether

economic duress should be a [legal claim] under Florida common law."

(Doc. 37 at 8)

## CLAIM PRECLUSION

Rule 18(a), Federal Rules of Civil Procedure, permits a party to plead in one action "as independent or alternative claims, as many claims as it has against the opposing party."  Rule 8(d) permits a party to plead in one action "as many separate claims or defenses as it has, regardless of consistency."  These and other rules of pleading govern what a party may assert in one action; claim preclusion, a component of *res judicata*, governs what a party must assert, if at all, in one action. *Williamson v. Columbia Gas & Elec.*, 186 F.2d 464, 469-70 (3d Cir. 1950) ("The principle [that] pervades the modern systems of pleading, especially the federal system, as exemplified by the free permissive joinder of claims, liberal amendment provisions, and compulsory counterclaims, is that the whole controversy between the parties may and often must be brought before the same court in the same action."); *Mayo Clinic Jacksonville v. Alzheimer's Institute of Am.*, 683 F. Supp. 2d 1292, 1299 (M.D. Fla. 2009); *J. Aron & Co. v. Serv. Transp.*, 515 F. Supp. 428 (D. Md. 1981) (discussing the simultaneous expansion of permissive federal pleading and federal claim preclusion).

Concerned with the effect of a judgment, *res judicata* comprises both claim preclusion and issue preclusion:

> The rules of *res judicata*, as the term is sometimes sweepingly used, actually comprise two doctrines concerning the preclusive effect of a prior adjudication.  The first such doctrine is "claim preclusion," or true *res judicata*.  It treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same "claim" or "cause of action."
>
> . . .
>
> The second doctrine, collateral estoppel or "issue preclusion," recognizes that suits addressed to particular claims may present issues relevant to suits on other claims.  In order to effectuate the public policy in favor of minimizing redundant litigation, issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties.

*Kaspar Wire Works v. Leco Engineering & Mach*, 575 F.2d 530, 535-36 (5th Cir. 1978) (Rubin, J.).

Claim preclusion embodies the concept of bar, which "prevents a plaintiff who loses in litigation from bringing a subsequent action based on the same transaction or series of transactions by simply asserting additional facts or by proceeding under a different legal theory."  18 *Moore's Federal Practice* § 131.10[3][a] (2011).  Thus, claim preclusion requires (1) a previous decision by a court of competent jurisdiction, (2) a final judgment on the merits, (3) identical parties, or those in privity with each party, in both actions, and (4) the "same cause of action."  *Davila v. Delta Air Lines*, 326 F.3d 1183, 1187 (11th Cir. 2003); *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1551 (11th Cir. 1990).[2]  In other

---

[2] The borrower challenges only whether the two actions arise from "the same transaction or series of transactions."

words, "A valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim."  *Restatement (Second) of Judgments* § 19.  The Eleventh Circuit uses "cause of action" and the *Restatement* uses "claim," but each authority considers whether the two actions arise from "the same transaction or series of transactions."[3]  *Compare Justice Oaks II, Ltd*, 898 F.2d 1544, 1551 (11th Cir. 1990), *with Restatement (Second) of Judgments* § 24.

Incapable of a "mathematically precise definition," the expression "same transaction or series of transactions" concerns whether "both actions were grounded upon the defendant's identical act or connected acts forming a single life-situation."  *Restatement (Second) of Judgments* § 24 cmt. a.  The inquiry invokes pragmatism:

> What factual grouping constitutes a "transaction," and what groupings constitute a "series" are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and

---

[3] A semantic confusion warrants attention.  *Garner's Dictionary of Legal Usage* 142 (3d ed. 2011) explains:

> *Cause of action* = (1) a group of operative facts, such as a harmful act, giving rise to one or more rights of action; or (2) a legal claim. Writers on civil procedure prefer that the term be confined to sense 1. The acceptance of sense 2 by some courts actually caused the drafters of the Federal Rules of Civil Procedure to avoid the term altogether and use *claim* instead.

Both the *Restatement*'s use of "claim" and the Eleventh Circuit's use of "cause of action" suggest the first sense in *Garner's* definition of "cause of action."  *See Restatement (Second) of Judgments* § 24; Wright & Miller, 18 *Fed. Prac. & Proc.* § 4402 (2012) ("There is now a growing tendency . . . to substitute the word 'claim' for the cause of action phrase.").  Consistent with the Eleventh Circuit, this order uses "cause of action" in the first sense, and uses "legal claim" in the second sense, appearing in *Garner's* definition of "cause of action."

> whether their treatment as a unit conforms to the parties' expectations
> or business understanding or usage.

*Restatement (Second) of Judgments* § 24 & cmts. a & b (cited with approval by *Justice Oaks II*, 898 F.2d at 1551; *Ragsdale*, 193 F.3d at 1238).   Thus, the focus concerns whether the action "arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action." *Ragsdale*, 193 F.3d at 1239; *Mayo Clinic*, 683 F. Supp. 2d at 1299.   If so, a party cannot avoid claim preclusion "by 'splitting' [the] claim into various suits, based on different legal theories (with different evidence 'necessary' to each suit)." *Regan v. Metro Life Ins. Co.*, 80 F. App'x 718, 721 (2d Cir. 2003); *accord Trustmark Ins. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002); *Nevada v. United States*, 463 U.S. 110, 129-30 (1983); *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1503 (11th Cir. 1990).

The borrower sued in *NAC I* for breach of a settlement agreement that purported to settle the legal claims eventually alleged in *NAC II*.   The two actions share the same predicate facts, the same origin, and the same motivation.   The borrower admits as much.   In the response to the motion to dismiss, the borrower points to paragraph sixteen of the complaint in *NAC I*:

> Due to the misapplication of the closing proceeds to the line of credit secured by [the borrower's] accounts receivable versus the [loan] secured by the Mortgage on the real property, [the borrower] was placed in a position of jeopardy of losing potential business opportunities and transactions with respect to the real property owned by [the borrower].   Specifically, the existence and amount of the Mortgage resulted in the inability of [the borrower] to proceed with these opportunities, which would have resulted in

> net profits to [the borrower] well into seven figures.  [The
> borrower] is not seeking a finding of liability on the part of [the
> lender] in this action, and is not seeking damages based upon the
> underlying dispute; rather, [the borrower] is providing *factual
> background* as to the existence of a substantial monetary dispute
> which resulted in the oral settlement agreement sought to be
> enforced herein.

(*NAC I*, Doc. 2) (emphasis added)  The passage confirms a common course of

dealing and a common factual predicate originating from the "misapplication"

(alleged as "factual background" in *NAC I*) and concluding with the "oral settlement

agreement."  *Trustmark*, 299 F.3d at 1270 ("[W]e make a fact-based inquiry into

whether the cases are based on the same factual predicate . . . .").

In response, the borrower argues that the legal claims asserted in *NAC II* could

not "mature" until the "oral settlement agreement" was defeated in *NAC I*:

> The claims in *NAC II* matured when the court in *NAC I* adjudged
> [that] the Oral Agreement was unenforceable and thereby released
> [the borrower] from the claims waiver [the borrower] agreed to in
> the Oral Agreement.  Then, [the borrower] was free to pursue its
> claims against [the lender] based on [the lender's] conduct in
> 2008, [the 'misapplication'].

(Doc. 51 at 3-4)  However, a legal claim accrues immediately upon the occurrence of

the last element of the legal claim; thus, the borrower "was free to pursue" a legal

claim alleged in *NAC II* as soon as the borrower suffered injury as a consequence of

the purportedly negligent "misapplication."  In other words, the legal claims in

*NAC II* accrued (or "matured," as the borrower says) before, and independent from,

the resolution of *NAC I*.

Certainly the borrower will not prevail on the legal claims for negligent "misapplication" (*NAC II*) unless Sharpe and Stanton's alleged "oral settlement agreement" (*NAC I*) fails.  But "likelihood of success" is not an element of a legal claim.  Nothing prevented the borrower from asserting the *NAC II* legal claims in *NAC I*, and nothing prevented the court's adjudicating the *NAC II* legal claims in *NAC I,* that is, nothing but the borrower's decision to split the claims and to force the lender to defend sequential actions – a consequence the borrower could have avoided by including the *NAC II* legal claims when granted a forborne opportunity to amend the complaint in *NAC I.*

A year after the conclusion of the borrower's first action originating from the 2008 "misapplication," the borrower accosts the lender with a second action originating from the 2008 "misapplication."  The borrower's separating the remedies and the claims for relief into sequential actions illustrates two central objectives of claim preclusion – the protection of a victorious party against oppression by a cunning adversary and the protection of the judiciary and the public fisc from burdensome, piecemeal litigation.  Wright & Miller, et al., 18 *Fed. Prac. & Proc. Juris.* § 4403 (2d ed. 2012).  The legal claims in *NAC II* could have, should have, and – perforce claim preclusion – must have been alleged, if at all, in *NAC I.*

The civil rules anticipate a transparent parity in pleading between the parties; each must plead with respect to a litigated episode every claim and defense, and

every counterclaim and defense, arising from the episode.  Although the borrower was not required at risk of claim preclusion to anticipate and plead in the initial complaint every possible claim (that is, not required to anticipate the defendant's preemptive attack on the enforceability of the oral agreement), the borrower, upon seeing the lender's attack and to avoid preclusion, was required to assert the other claims in the alternative by amending the complaint in the same action.  This is standard procedural practice occurring each day in trial courts across the country.  In the usual course, the plaintiff amends the complaint to include the alternative legal claims; here, the plaintiff, with leave to amend, unaccountably walked away, failed to amend, and abandoned the unraised, alternative legal claims, forever barred by the judgment.  No trump cards and no jokers are retained in stealth for later play.

## CONCLUSION

The lender's motion to dismiss (Doc. 43) is **GRANTED**.  This action is **DISMISSED WITH PREJUDICE**.  The clerk is directed to (1) terminate any pending motion and (2) close the case.

ORDERED in Tampa, Florida, on March 6, 2013.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE